# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

TERRY THOMAS JR.,      )
     )
       Plaintiff,      )
     )
       v.      )    Case Nos.    N19M-01-094
     )                N19M-12-202
     )                N21M-06-074
STATE OF DELAWARE,      )
     )
       Defendant.      )

Submitted: October 6, 2023
Decided: January 16, 2024

## ORDER

John W. Donahue IV, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Terry Thomas, Jr., Howard R. Young Correctional Institution, Wilmington, Delaware, *pro se*.

**O'CONNOR, M., Commissioner.**

## INTRODUCTION

This matter came before the Court upon three petitions for return of property filed by Plaintiff Terry A. Thomas Jr. ("Plaintiff") pursuant to 16 *Del. C.* §4784(j) and Superior Court Civil Rule 71.3. Plaintiff seeks the return of $12,170.00 seized on January 5, 2019; $8,832.00 seized on October 10, 2019; and $6,053.00 seized on April 28, 2021. On April 12, 2023, May 24, 2023, and June 22, 2023, the Court convened a bench trial, and at the conclusion of the trial the Court reserved decision. This is my decision after considering the presentations of the parties, the record, and evidence presented at trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff has sought the return of property seized by New Castle County Police Department ("NCCPD") officers during three separate traffic stops.[1] Each traffic stop and seizure will be considered independently, based on the information the police officers were aware of at each traffic stop and the immediate investigation conducted thereafter. The traffic stops and accompanying seizures will be addressed sequentially, below.

---

[1] The three Petitions for Return of Property were consolidated for purposes of trial. To the extent this Order refers to transcript citations, the docket item number for the transcript relates to Civil Action No. N19M-01-094.

1. **The January 5, 2019 Traffic Stop.**

On January 5, 2019, NCCPD Detective Matthew Arnold ("Detective Arnold") was working as a member of the NCCPD's Mobile Enforcement Team ("MET Team").[2] At approximately 8:30 p.m., Detective Arnold observed a white Cadillac fail to maintain its lane of travel on Airport Road, and conducted a traffic stop due to the traffic violation.[3] As Detective Arnold approached the Cadillac, he detected an odor of marijuana emanating from the vehicle.[4] Plaintiff was driving the vehicle, and a minor was in the front passenger seat. After removing the Plaintiff and minor from the car, Detective Arnold, with the assistance of other MET Team members, searched the vehicle. In the trunk, Detective Arnold located multiple duffle bags, one of which contained ten bundles of United States currency totaling $9,980.00.[5] The police also recovered $2,190.00 from Plaintiff's pants pocket.[6] In a separate duffel bag in the trunk, Detective Arnold observed marijuana residue.[7] A search of the interior of the car and the minor resulted in the discovery of marijuana residue

---

[2] Detective Arnold began his law enforcement career with NCCPD in March 2013. (Docket Item ("D.I.") 38, April 12, 2023 Trial Tr. at 13:2-6). Detective Arnold has received training on drug identification and made more than one hundred marijuana related arrests (*Id.* at 34:10 – 35:14.). The MET Team focuses on addressing quality of life issues such as prostitution, loitering, illicit drug use, car burglaries, and "anything where the crime numbers seem to be higher in one concentrated area than others." *Id.* at 13:22 – 14:1.
[3] *Id.* at 14:17 – 15:3.
[4] *Id.* at 16:2-3.
[5] *Id.* at 18:2-10. State's Ex. 2, Photo. The currency was bundled in $1,000.00 increments, except for one bundle, which contained $980.00.
[6] *Id.* at 18:11-21. State's Ex. 1, Photo.
[7] *Id.* at 18:24-19:2. The residue was neither recovered nor tested by the MET Team officers.

in the center console, and the recovery of a small amount of marijuana from the minor's pocket. [8]

On scene, Detective Arnold questioned Plaintiff about his employment and the source of the currency. When asked for the name of his employer, Plaintiff first told the detective he worked for "Duncan and Sons," but when asked where the business was located, he could not provide an address.[9] Plaintiff then claimed he owned a business called "American Automotive."[10] Detective Arnold then conducted business license checks for "Duncan and Sons" and "American Automotive," and he could not confirm a business license for either entity.[11] Plaintiff next claimed his business was "AmeriKingz Automotive."[12] When Detective Arnold asked Plaintiff why he possessed the currency, Plaintiff generically stated that he needed cash on hand to operate his business.[13] After giving Plaintiff multiple opportunities to explain in detail why he possessed cash on that particular night, Plaintiff did not provide Detective Arnold a specific reason for possessing $12,170.00.[14]

---

[8] *Id.* at 19:3-6.
[9] *Id.* at 25:3-10.
[10] *Id.* at 25:11-14.
[11] *Id.* at 25:14-19.
[12] *Id.* at 25:20 – 26:1. Detective Arnold subsequently confirmed AmeriKingz Automotive had a valid business license. *Also see* Plaintiff's Ex. 3, Business License.
[13] *Id.* at 26:15-19.
[14] *Id.* at 26:15 – 27:1.

Detective Arnold seized the currency, and when he arrived back at NCCPD headquarters, he enlisted the assistance of NCCPD Corporal Paul Smack ("Corporal Smack"), and his canine partner "Thor" to conduct a "sniff test" on the currency – the sniff test involves commanding the canine to search for the odor of illegal substances on the currency. To conduct the sniff test, the canine handler directs the canine to conduct a pre-sniff of the location where the currency would later be hidden, typically a room with several lockers.[15] If the canine does not indicate the presence of drugs in the area, which was the case here, the handler and canine exit the area and another officer, on this occasion Detective Arnold, would then hide the currency in one or more lockers and leave the room.[16] Once the currency is hidden, the handler and canine would return to the room and conduct the sniff test – the handler then directs the canine to smell for the presence of controlled substances on the currency in the locker room.[17] The canine's positive response would indicate the presence of illicit drugs on the seized money, and the handler would report the positive finding to the investigating detective.[18]

Corporal Smack described the standard protocol followed in this investigation, and after Detective Arnold hid the seized currency in different lockers

[15] *Id.* at 148:8-21.
[16] *Id.* at 148:8 – 149:17.
[17] *Id.* at 149:8 – 149:17.
[18] *Id.* at 24:11-22.

at NCCPD headquarters, Corporal Smack gave Thor a command to conduct the sniff test. Corporal Smack observed Thor alerting to the two lockers where Detective Arnold had hidden the currency.[19] After explaining the process of a sniff test, and reviewing Thor's training and experience, Corporal Smack opined that the sniff test conducted by Thor on January 5, 2019 evidenced a positive result for the presence of illegal controlled substances on the currency seized from Plaintiff.[20]

At the conclusion of the investigation, Detective Arnold cited Plaintiff for a traffic violation and seized $12,170.00 and a Samsung cellphone.[21] Detective Arnold, relying upon his training and experience, and considering all of the aforementioned facts, opined that Plaintiff had just completed a drug transaction, delivering a quantity of marijuana to buyer(s), which resulted in Plaintiff being in possession of the seized currency.[22]

---

[19] *Id.* at 142:15 – 143: 5. Thor is a dual-purpose canine, trained to track suspects and detect various narcotics, including marijuana. *Id.* at 143:6-15. Beginning in 2016 and through the present day, Thor has undergone consistent training and received several certifications. *Id.* at 143:19 – 144:5. State's Exhibit 17, Canine Certifications. After a review of the State's foundational testimony for the admissibility of the sniff test results, the State presented sufficient evidence to demonstrate Thor's training and reliability requirements were satisfied to detect the presence of concealed drugs consistently and accurately, and the evidence is admissible.

[20] After the money was placed in two separate lockers, Thor alerted on the two lockers containing the seized money. *Id.* at 148:8 – 151:14.

[21] Detective Arnold obtained a search warrant for the cellphone, but the police were unable to access data on the cellphone. Detective Arnold returned the cellphone to Plaintiff without searching it. *Id.* at 29:2-20.

[22] *Id.* at 55:5-15.

5

## 2. **The October 10, 2019 Traffic Stop.**

On October 10, 2019 at approximately 10:55 p.m., Detective Arnold was working with the MET Team in an unmarked police vehicle when he observed a black Cadillac in the vicinity of Christiana Road and the Rambleton Acres neighborhood.[23]   As the Cadillac exited Rambleton Acres, Detective Arnold observed the driver fail to signal 300 feet prior to negotiating a turn in violation of 21 *Del. C.* § 4155(b).[24]   Detective Arnold alerted other MET Team members of the traffic violation, and one or more marked NCCPD police vehicles conducted a traffic stop of the black Cadillac in a Shell gas station at the intersection of Airport Road and Christiana Road.[25]   Plaintiff was the operator of the black Cadillac, and he was accompanied by an adult male passenger.[26]

Upon approaching the black Cadillac, the MET Team officers detected an odor of marijuana emanating from the vehicle.[27]   The officers eventually searched the trunk of the black Cadillac and seized approximately three pounds of marijuana

---

[23]  *Id.* at 39:8-12.
[24] *Id.* at 40:16-21.  *See generally*
[25] *Id.* at 40:12-25.  Detective Arnold explained, subsequent to the January 5, 2019 car stop but during the month of January 2019, he conducted an NCIC inquiry on Plaintiff which revealed Plaintiff had been convicted on March 22, 2012 of felony possession of a controlled substance. State's Ex. 9, Superior Court Sentencing Order, *State of Delaware v. Terry Thomas*, Case No. 1110015834.
[26] D.I. 38, April 12, 2023 Trial Tr. at 41:6-15.
[27] *Id.* at 41:19-23.

packaged in multiple plastic bags.[28]  A search of Plaintiff's pants pockets resulted in the seizure of $8,832.00.[29]  The money was rubber-banded in at least seven bundles, along with a wad of loose currency.[30]  When Detective Arnold asked Plaintiff to explain the source of the currency, Plaintiff claimed to have acquired the money from selling catalytic converters.[31]  The police arrested Plaintiff for possession of three pounds of marijuana, [32] and seized $8,832.00, a Samsung cellphone, and an Apple iPhone.[33]

Detective Arnold brought the seized currency back to NCCPD headquarters. After Plaintiff's apprehension on October 10, 2019, and continuing into the early morning of October 11, 2019, Corporal Smack and Thor were again tasked with conducting a sniff test on the currency in the men's locker room of the Gilliam Building.[34]  Following the same standard procedure described *supra* during the

---

[28] The marijuana was found in a white trash bag which contained three other plastic bags containing marijuana. State's Ex. 4, Photo; Ex. 5, Photo; D.I. 38, April 12, 2023 Trial Tr. at 46:21 – 47:7.
[29] *Id.* at 42:3-8.
[30] *Id.* at 42:3-14; State's Ex. 7, Photo of currency; D.I. 38, April 12, 2023 Trial Tr. at 45:16-21.
[31] *Id.* at 42:23 - 43:4. Plaintiff disclosed he did not have receipts or documentation for the seized money or business transactions information, but asserted nonetheless his primary source of income was selling catalytic converters. *Id.* at 43:5-9.
[32] *Id.* at 46:7-20.  *See also* State's Exhibits 4-6, Photos.  The suspected marijuana was analyzed by the State of Delaware Division of Forensic Science Forensic Chemistry Unit, which confirmed the substance was, in fact, marijuana.  Additionally, during trial Plaintiff admitted possessing the marijuana in the trunk of the vehicle – but he claimed the "weed wasn't all mine."  D.I. 39, May 24, 2023 Trial Tr. at 69:15-21.
[33] Plaintiff told the police that the Samsung cellphone was his, and the iPhone belonged to his girlfriend, Sunday Grubb.  D.I. 38, April 12, 2023 Trial Tr. at 46:7-11; 57:14-19.  Later during the hearing, he testified the iPhone was his cellphone.  *Id.* at 79:13-24.
[34] *Id.* at 151:25 – 152:23.

January 5, 2019 sniff test, Thor completed a pre-scan of the Gilliam Building locker room at 0027 hours. Detective Arnold then placed the seized currency in a locker, and at 0038 hours, Thor performed the sniff test, alerting on the locker where Detective Arnold hid the $8,832.00, indicating the odor of controlled substances on the currency.[35]

Detective Arnold subsequently arrested Plaintiff for Possession of a Controlled Substance in a Tier I Quantity with an Aggravating Factor, in violation of 16 *Del. C.* § 4754; Drug Dealing, in violation of 16 *Del. C.* § 4754; Failure to Signal 300' before Turning a Motor Vehicle, in violation of 21 *Del. C.* § 4155; and Improper Display of a License Plate, in violation of 21 *Del. C.* § 2126.[36]

Just after Plaintiff's detention on October 10, 2019, and continuing NCCPD's investigation into Plaintiff's drug dealing activity, a phone data extraction was conducted on the seized Samsung and iPhone cellphones.[37] The extractions produced two reports, one for each cellphone.[38] Once an extraction report was

---

[35] *Id.* at 151:15 – 153:16. After a review of Corporal Smack's testimony for the admissibility of the sniff test which occurred the early morning of October 11, 2019, the State presented sufficient evidence to demonstrate Thor's training and reliability requirements were satisfied to detect the presence of concealed drugs consistently and accurately during this second sniff test in October 2019.

[36] As noted *supra* at fn. 25, Detective Arnold was aware that Plaintiff had a prior felony drug conviction, and that prior felony conviction contributed to the Detective's belief that Plaintiff was "carrying a larger amount of [marijuana] than what would usually be considered for personal use." *Id.* at 50:19 – 51:20; 53:22 – 54:6.

[37] *Id.* at 58:1-16.

[38] *Id.*

created, the police utilized software to search for specific keywords, producing a refined report based on specific search term(s).[39]

With respect to the Samsung cellphone, NCCPD created a report reflecting results of keyword search for the words "bud," "oz," and "Terry." Detective Arnold explained that the search for the word "bud" was performed because "bud" is a common term for marijuana.[40] The Samsung extraction report for "bud" revealed multiple text messages documenting Plaintiff's attempts to sell or deliver marijuana.[41] Specifically, on December 27, 2018, the Samsung phone received an inquiry to Plaintiff asking: "U got bud, need 1/8??."[42] In an outgoing message on December 29, 2018, Plaintiff texted "I got great deal on bud limited time only." On September 9, 2019, an incoming message to Plaintiff stated "Yo wyd I need some bud," and on September 30, 2019, an incoming message to Plaintiff asked, "What's the name of this bud?"[43]

NCCPD also searched the Samsung extraction report for the keyword "oz" (ounce).[44] Detective Arnold explained marijuana is commonly bought and sold in ounce quantities.[45] The report included the following references to "oz:" (a) on July

---

[39] *Id.* at 58:9-25 – 59:4. All cellphone extraction reports were admitted into evidence without objection. *Id.* at 70:3-5; 75:20-25; 76:3; 79:13-25; and 81:2-6.
[40] *Id.* at 59:11.
[41] *Id.* at 61:10-15.
[42] State's Ex. 10, Samsung Extraction Report for keyword "bud."
[43] *Id.*
[44] State's Ex. 11, Samsung Extraction Report for keyword "oz."
[45] D.I. 38, April 12, 2023 Trial Tr. at 67:5-17; 69:5-13.

6, 2019, Plaintiff sent two outgoing messages informing the recipient "Oz 150" and "I need 150 and oz all [the] way up,"[46] indicating Plaintiff was selling marijuana for $150 per ounce,[47] (b) on July 20, 2019, an incoming message to Plaintiff read "Front me oz?" (c) on July 23, 2019, another incoming message reads: "All good, can you bring me an oz? I don't have money till the morning tho;"[48] and (d) on October 7, 2019, just three days before the October 10, 2019 traffic stop, an incoming message to Plaintiff at 11:56 AM said "I need oz."[49] The Samsung extraction report details incoming and outgoing text messages which reflect a prospective buyer asking Plaintiff to sell marijuana, or Plaintiff offering marijuana for sale to a buyer.

NCCPD also conducted a keyword search on the seized iPhone for "QWAP," or a quarter pound of marijuana.[50] The iPhone extraction report searching the term QWAP includes references to sales of marijuana in quarter pound quantities for the time period of October 6, 2019 to October 11, 2019 (encompassing the October 10, 2019 arrest). Specifically, relevant to the October 10, 2019 car stop, there are

---

[46] *Id.*

[47] *Id.* at 70:25 – 71:13. On October 10, 2019, Plaintiff was arrested in possession of approximately three pounds of marijuana. Assuming Plaintiff sold an ounce of marijuana for $150.00, or, as discussed *supra*, a quarter pound of marijuana for $600.00, the street value of the marijuana seized on October 10, 2019 was $7,200.00.

[48] *Id.*

[49] State's Ex. 11, NCCPD Extraction Report.

[50] D.I. 38, April 12, 2023 Trial Tr. at 74:25 – 75:7. Also see State's Ex. 13 (iPhone Extraction Report for keyword "QUAP"). While Plaintiff maintained the iPhone was not his phone, the iPhone was in his possession, and many text messages on the iPhone demonstrated that Plaintiff, as "Terry," was using the iPhone, for legal and illegal purposes. *See* State's Ex. 13 & State's Ex. 18. Under these circumstances, Plaintiff's purported denial of *ownership* of the iPhone is irrelevant.

twenty-seven text messages between October 6, 2019 and October 11, 2019, with eighteen incoming and nine outgoing messages, where Plaintiff agrees to deliver a "QUAP" and an "extra 8gs" to a buyer on October 9, 2019 at 7:58 pm and informs the prospective purchaser the price is $600.00. The next day, which was the day of Plaintiff's detention and arrest -- October 10, 2019, at 3:01 p.m., the same individual "need[ed] another quap." Detective Arnold concluded, based on his training and experience, as well as the facts and reasonable inferences which were developed during Plaintiff's October 10, 2019 detention and investigation, these exchanges memorialized Plaintiff selling quarter pound quantities of marijuana on the dates referenced in the extraction reports.[51]

On November 2, 2020, Plaintiff pled guilty to one count of Aggravated Possession of Marijuana with an Aggravating Factor, a felony, and this Court sentenced Plaintiff to 8 years Level V suspended for 18 months level II probation.[52]

---

[51] D.I. 38, April 12, 2023 Trial Tr. at 84:6 – 88:19. NCCPD also conducted a keyword search on the seized Samsung cellphone for the name "Terry," to connect Plaintiff to the Samsung cellphone. *See* State's Ex. 12. As discussed in fn. 33, Plaintiff admitted the Samsung cellphone was his phone. Additionally, the State offered into evidence the iPhone extraction report searching for the keyword "Terry." *See* State's Ex. 18. That report includes incoming and outgoing text messages sent by and to "Terry" from January 23, 2019 to October 11, 2019. *Id.*

[52] *See* State's Ex. 8, Superior Court Case No. 19110006607, Sentence Order, Truth in Sentencing Guilty Plea Form, and Immediate Sentencing Form.

### 3. The April 27, 2021 MET Team investigation and the April 28, 2021 traffic stop.

On April 27, 2021, Detective Jacob Gruber of the MET Team was conducting surveillance on a residence at 16 Defoe Circle, Newark, Delaware.[53] The subject of that investigation was Thomas Epperson ("Epperson"), described by Detective Gruber as "a constant nuisance, a known drug user, [and] a known drug dealer."[54] At that time, the police had received intelligence that Epperson was "selling drugs out of the residence of 16 Defoe [Circle] . . .."[55]

While conducting surveillance, Detective Gruber observed Plaintiff park the same black Cadillac stopped by the MET Team on October 10, 2019 directly in front of Epperson's house.[56] Plaintiff exited the driver's seat of the Cadillac and responded to the trunk.[57] As he did so, Epperson and a female exited the residence, joining Plaintiff at the vehicle.[58] After a short conversation, Plaintiff removed a bag from the trunk of the vehicle and carried the bag into Epperson's house as he,

---

[53] *Id.* at 123:16 – 124:24. Detective Gruber was a member of the MET Team and was present at all three car stops and seizures addressed in this Order. *Id.* at 121:25 -- 122:17. Prior to the November 5, 2019 stop, Detective Gruber had no personal knowledge of the Plaintiff. *Id.* at 122:18-20. On April 27, 2021, Detective Gruber was aware of Plaintiff's involvement in drug dealing due to Plaintiff's 2019 vehicle stops and seizures. *Id.* at 126:10-14.
[54] *Id.* at 124:21 – 125:5.
[55] *Id.* at 125:6 – 125:7.
[56] *Id.* at 125:15-25.
[57] *Id.* at 126:4-6. *Also see* State's Ex. 15, Photo.
[58] *Id.* at 126:6-23. *Also see* State's Ex. 15, Photo.

Epperson and the female went inside the residence.[59] Just a short while later, Plaintiff exited the residence alone, without the bag he removed from the trunk and brought into the house, entered the driver's seat of the Cadillac, and drove off.[60]

Detective Gruber concluded, based on his observations as well as his knowledge and prior experience, that Plaintiff's conduct was "indicative of a drug deal."[61] Detective Gruber explained:

> Like I said, everything, all the factors that went into my observations that day. I'm aware of Mr. Epperson. I am aware of [Plaintiff] from previous investigations. I'm aware that [Plaintiff has] been arrested in possession of drugs. I'm aware that [Plaintiff has] been in possession of a lot of drugs, three pounds of marijuana. I'm aware that I personally have arrested and been present for Mr. Epperson being in possession of a large quantity of drugs as well. So that day when I see two people that I am aware have a long drug history, indicative of them dealing drugs, and I see what I see, which is one individual, who I'm aware has a history of dealing drugs, take a bag out of their vehicle and go into another person's house, who has a history of dealing drugs, and then they come back out a short time after without that bag, that is indicative to me of a drug deal.[62]

The next day, April 28, 2021, NCCPD Sergeant Tim Golden ("Sergeant Golden"), supervisor of the MET Team, was conducting surveillance as a black Cadillac approached his location in a shopping center at the MAX Mini-mart on

---

[59] *Id.* at 127:2-6. The money seized by the NCCPD at the January 5, 2019 traffic stop was seized from a bag in the trunk; the approximate three pounds of marijuana seized during the October 10, 2019 traffic stop was seized from two bags within a larger bag in the trunk; Plaintiff was observed removing a bag from the trunk and carrying it into a known drug dealer's residence; and the MET Team discovered and seized marijuana from Plaintiff's trunk on April 28, 2021.

[60] *Id.* at 127:6-9. *Also see* State's Ex. 15 & 16, April 27, 2021, Photos.

[61] *Id.* at 127:18.

[62] *Id.* at 139:15 – 140:10.

River's End Drive.[63] As the Cadillac passed Sergeant Golden, he recognized the vehicle and license plate as being Plaintiff's black Cadillac observed by Detective Gruber on April 27, 2021.[64] As Sergeant Golden attempted to exit the shopping center to follow Plaintiff, Plaintiff accelerated the Cadillac at an extremely high rate of speed on Rivers End Drive.[65] Sergeant Golden was already familiar with Plaintiff -- as a supervisor, he was aware of Detective Gruber's observations of Plaintiff from April 27, 2021 -- and Plaintiff was "known throughout the area for his illegal activities."[66]

As Sergeant Golden was driving to catch up to Plaintiff, he saw him make a right-hand turn onto Route 7 southbound without using a turn signal.[67] Sergeant Golden eventually caught up to Plaintiff in the area of Route 7 and Route 40,[68] activating his fully marked Chevrolet Tahoe's emergency equipment to stop Plaintiff for suspected motor vehicle violations. As soon as the emergency equipment was activated, Plaintiff pulled into a Ruby Tuesday restaurant parking lot, and the police began a traffic stop.[69]

---

[63] *Id.* at 169:9-23.
[64] *Id.* at 171:1-11; 172:7-15.
[65] *Id.* at 171:12-21.
[66] *Id.* at 172:23 – 173:3.
[67] *Id.* at 174:5-14.
[68] *Id.* at 174:24 – 175:8.
[69] *Id.* at 175:4-8.

As Plaintiff's vehicle was initially stopped in the parking lot, Sergeant Golden observed Plaintiff leaning back and to the right while in the driver's seat. To Sergeant Golden, this indicated Plaintiff was either reaching for a weapon or trying to conceal contraband.[70] As Sergeant Golden moved closer to the driver's side of the vehicle, Detective Gruber, who also arrived on scene, approached on the passenger side, where an adult male sat.[71] Upon reaching the vehicle, Sergeant Golden smelled a strong and distinct odor of raw marijuana, and to address his concern regarding Plaintiff's behavior in the driver's seat, Sergeant Golden removed Plaintiff from the vehicle.[72] When Plaintiff exited the vehicle, his pants and belt were unbuckled, and his zipper was down.[73] Plaintiff was directed to the rear of the vehicle and placed into handcuffs.[74]

Before Plaintiff was placed into a patrol vehicle, Officer Knotts ("Knotts") patted him down and removed $453.00 from his pants pockets.[75] When asked how much currency he had in his possession, Plaintiff responded a "couple hundred bucks."[76] As Knotts continued to pat down Plaintiff, he felt a foreign object in

---

[70] *Id.* at 175:20 – 176:1. Plaintiff conceded to concealing the $5,600.00 in his boxer shorts, claiming that on prior traffic stops, the police confiscated money "for no reason." D.I. 39, May 24, 2023 Trial Tr. at 73:7-9.

[71] D.I. 38, April 12, 2023 Trial Tr. at 176:2-10.

[72] *Id.* at 176:10-15.

[73] *Id.* at 176:15-24.

[74] *Id.* at 177:2-18.

[75] *Id.* at 178:19-25.

[76] *Id.* at 179:5-7.

Plaintiff's groin area.[77] Sergeant Golden reached into Plaintiff's boxer shorts and removed a large amount of cash folded together, banded by a rubber band,[78] later determined to be $5,600.00.[79] At the scene, when asked how much money he had in his pockets and the amount of money he attempted to hide in his boxer shorts, Plaintiff could not provide an exact amount to the police.[80]

A contemporaneous search of the vehicle resulted in the seizure of a bag of marijuana concealed inside a compartment behind the dashboard radio controls.[81] Additionally, the front passenger had a bookbag at his feet; from the inside of the bookbag, the police seized marijuana, a digital scale, and packaging baggies.[82] In the trunk of the vehicle, the police found a box pushed almost up against the rear back seats within the car which contained marijuana in at least two plastic bags.[83] The marijuana seized from the trunk was packaged in clear plastic bags, and those

---

[77] *Id.* at 179:18-20.
[78] *Id.* at 179:24 – 180:6. *See also* State's Ex. 19, Photo.
[79] *Id.* at 182:11-22; State's Ex. 19, Photo. The police seized $6,053.00 from Plaintiff on April 28, 2021. *Id.* at 184:23-25.
[80] *Id.* at 199:14 – 200:10.
[81] *Id.* at 185:10 - 186:3. *See also* State's Ex. 26 & 27.
[82] *Id.* at 189:5-13. The passenger initially only claimed ownership of the marijuana in the backpack found at his feet in the vehicle. *Id.* at 197:25 – 198:5. It was only after the police discovered additional marijuana in a center console compartment (which the passenger could not open) and trunk (the passenger "forgot" the marijuana in the trunk) that the passenger expressed ownership of all seized marijuana. *Id.* at 198:5-15. Considering the officer's testimony regarding the passenger's claims and memory deficits during the traffic stop, the passenger's claim that all of the marijuana seized from within the vehicle belonged to him is not credible.
[83] *Id.* at 191:10-17; 192:15-21; 196:9-15. *See also* State's Ex. 14, December 13, 2021 Forensic Laboratory Report. Officer Gruber explained, based on his training and experience, finding a large Ziplock bag with marijuana inside it indicates a drug dealer would "carry a larger amount [of marijuana] and then break that up into smaller amounts to sell." *Id.* at 227:5-9.

clear plastic bags had red and green tops, respectively.[84]  And, the color and type of bags recovered in the trunk were consistent with the bag containing marijuana found in the center console of the vehicle and the bag containing  marijuana discovered in the passenger's backpack.[85]  The police also seized two cell phones.[86]

Plaintiff testified that the seized currency in his possession at each traffic stop was lawfully earned business proceeds.   He claimed his business required him to carry large amounts of currency so that he could make on the spot cash offers to purchase automobiles from prospective sellers.  Being able to immediately offer cash to a prospective seller allowed Plaintiff to quickly close a purchase.  Plaintiff also claimed to earn income from providing mechanic's services and selling vehicles and vehicle parts (motors, transmissions, etc.)  At times, he would buy a car, remove the catalytic converter, and then sell the catalytic converter and/or the vehicle to a junkyard for recycling.  Plaintiff also presented evidence from William "Dave" Aldridge, who claimed to have given Plaintiff two loans – a $5,000.00 loan in December 2018 for Plaintiff to purchase a tow truck, and a $7,000.00 loan in September 2019.[87]  With respect to the April 28, 2021 seizure, Plaintiff claimed that

---

[84]  *Id.* at 192:19 – 193:14.
[85]   The marijuana found on April 28, 2021 in at least four separate baggies was tested by the Delaware Division of Forensic Science and determined to be marijuana.  *See* State's Ex. 14, Dec. 13, 2021 Controlled Substances Laboratory Report.
[86]  D.I. 38, April 12, 2023 Trial Tr. at 216:2-4.
[87]  State's Ex. 34, Note.  Aldridge's claim to loan Plaintiff $5,000.00 in *September 2018* for a tow truck is inconsistent with Plaintiff's claim that he was shopping for a tow truck in September 2019.  And, beyond this inconsistency, Plaintiff's claim of a loan is suspect, as Plaintiff had

he possessed the currency to pay for a construction project at his mother's home in Newark, Delaware.

As is discussed further below, I found the State's witnesses credible and their testimony consistent. I did not reach the same conclusion as to Plaintiff's testimony and the evidence presented to rebut the presumption of forfeiture. Plaintiff's testimonial and documentary evidence was muddled and incomplete, and neither Plaintiff nor his witnesses provided credible evidence to rebut the presumption of forfeiture.

## STANDARD OF REVIEW

Civil forfeitures are governed by provisions of 16 *Del. C.* § 4784, a statute intended by Delaware's Legislature to "cripple the trafficking and sale of illegal drugs."[88] Section 4784 authorizes law enforcement to seize and forfeit personal property which has been used in the perpetration of drug related crimes.[89] To establish forfeitability of currency pursuant to 16 *Del. C.* § 4784, the State has the initial burden of demonstrating probable cause that the money subject to forfeiture

---

written Aldridge a letter from prison prior to the trial, telling him "I need *someone* to come to my hearing and tell the judge they loaned me $5K back in 2019 so I can get the whole $27K back." *See* State's Ex. 33, Letter. Under the circumstances, Plaintiff's credibility, and the letter, which does not reference a loan, is suspect, and Aldridge's claim of advancing Plaintiff a loan, is not credible.

[88] *In the Matter of $13,584.00 in United States Currency, Petitioner Jeffrey Crippen*, 2018 WL 6839753, at *3 (Del. Super. Dec. 28, 2018), quoting *In the Matter of One 1987 Toyota*, 621 A.2d 796, 798 (Del. Super. May 15, 1992).

[89] *Jackson v. State*, 2016 WL 3960279, at *1 (Del. Super. July 19, 2016).

18

was found in close proximity to forfeitable controlled substances,[90] was found to have trace amounts of controlled substances on the money,[91] or the money was "furnished or intended to be furnished in exchange for illegal substances, or the profits or proceeds of sales related thereto."[92] This Court has previously held that "[t]he probable cause standard for forfeiture is essentially the same as that applied in Fourth Amendment search and seizure cases."[93]

Pursuant to § 4784(a)(7), the State "does not need to establish a specific illegal drug transaction, but rather, need only to demonstrate reasonable grounds to believe that a substantial connection exists between the seized cash and drug dealing."[94] With respect to § 4784(a)(7)(b), the statute does not specify the minimum amount of a controlled substance necessary to establish a "trace" amount – a minimum amount is sufficient. And, a positive hit by a trained canine has been repeatedly recognized as sufficient evidence to meet the trace amount requirement.[95] Finally, the State can institute civil forfeiture proceedings pursuant to Superior Court Civil Rule 71.3,

---

[90] 16 *Del. C.* § 4784(a)(7)(a).
[91] 16 *Del. C.* § 4784(a)(7)(b).
[92] *State v. Worley*, 2019 WL 169427, at *2 (Del. Super. Jan. 11, 2019), citing *In the Matter of $13,584 in United States Currency Petitioner Jeffrey Crippen*, 2018 WL 6839753, at *6; *In the Matter of $2,500 United States Currency*, 2018 WL 5117805, at *3 (Del. Super. Oct. 19, 2018).
[93] *In the matter of $5,662 United States Currency, Petitioner: Royce Brown*, 714 A.2d 106, 110 (Del. Super. Mar. 10, 1998), quoting *In the Matter of One 1987 Toyota*, 621 A.2d 796.
[94] *State v. Worley*, 2019 WL 169427, at *3 (Del. Super. Jan. 11, 2019), citing *In Re: Matter of $5,662. U.S. Currency, Petitioner: Royce Brown, 714* A.2d at 113.
[95] See *In the Matter of $13,584 in United States Currency Petitioner Jeffrey Crippen*, 2018 WL 6839753, at *5; *United States v. Carr*, 25 F.3d 1194, 1203 (3d Cir. 1994).

regardless of (a) whether a Petitioner had been arrested and charged with criminal offenses, and (b) whether the State successfully prosecuted a Petitioner through conviction. In fact, the acquittal or dismissal of charges in a criminal proceeding does not preclude the commencement of civil forfeiture proceedings.[96]

If the State satisfies its burden, the burden then shifts to the Plaintiff to prove by a preponderance of the evidence (1) a possessory interest in the property, and (2) that the property was unlawfully seized or was not subject to forfeiture.[97]

## DISCUSSION

### a. The State established probable cause for the seizure of the currency during the three vehicle stops.

With respect to all three seizures, this Court concludes the State has demonstrated probable cause to seize Plaintiff's currency and to institute forfeiture proceedings.

#### 1. The January 5, 2019 Seizure.

##### a. The State has established probable cause that the seized funds were subject to forfeiture.

As to the first seizure on January 5, 2019, two independent sources establish probable cause for the seizure of the currency and the institution of forfeiture proceedings. First, the State's evidence established probable cause that the seized

---

[96] Super. Ct. R. Civ. Pro. 71.3(f)(2).
[97] 16 *Del. C.* § 4784(j); *also see State v. Worley*, 2019 WL 169427, at *2, citing *Scott v. State*, 2003 WL 21538033, at *5 (Del. Super. May 16, 2003).

20

money was "furnished or intended to be furnished, in exchange for a controlled substance or drug paraphernalia" satisfying 16 *Del. C.* § 4784(a)(7). And, the State also satisfied 16 *Del. C.* § 4784(a)(7)(b), because through the sniff test, the State's demonstrated probable cause for the existence of trace elements of illegal drugs present on the seized currency.

On January 5, 2019, Detective Arnold conducted a traffic stop after observing Plaintiff commit a traffic offense. As he approached the vehicle, he detected an odor of marijuana emanating from the car. A subsequent search of the vehicle resulted in the recovery of $9,980.00 from ten bundles of currency found in a duffel bag in the trunk, and $2,190.00 from Plaintiff's pants pocket. The police also discovered, in a separate duffel bag in the trunk, marijuana residue, they observed additional marijuana residue in the center console of the vehicle, and a small amount of marijuana in the minor passenger's pocket.

A subsequent canine sniff test on the currency evidenced the presence of trace amounts of illicit drugs on the currency.

When asked why he had so much currency in his possession, Plaintiff claimed to work at "Duncan and Sons" and "American Automotive," two businesses that, if they existed at all, did not have a valid business license. Plaintiff eventually provided Detective Arnold the name of a third business – Amerikingz Automotive, and generically claimed this was his business and he needed cash to operate it.

21

The record also reflects that on January 5, 2019, Plaintiff failed to provide Detective Arnold any specific reason for possessing more than $12,000 -- Plaintiff did not claim the money was proceeds from any prior specific legitimate business transaction and did not tell the officer what he intended to do with the money. Taking all of the aforementioned information into consideration, and based on his training an experience, Detective Arnold opined that Plaintiff had just completed a drug transaction, delivering a significant amount of marijuana to a buyer, which resulted in Plaintiff being in possession of more than $12,000.00.

### b. The Plaintiff has failed to rebut, by a preponderance of the evidence, the presumption of forfeiture.

In the Petition for Return of Property regarding the January 5, 2019 seizure, plaintiff generically asserted the seized money was from "multiple clients and business transactions."[98]  At trial, Plaintiff claimed that the currency seized on January 5, 2019 was "acquired multiple ways."[99]  To support his assertion, Plaintiff entered into evidence incomplete and uncorroborated documents --  handwritten receipts with little to no detail billing for mechanic's work, sales of vehicle parts (notes including sales of an "LS Motor," "RIC Rims", "Jeep parts," and "200 R4"),[100] and proceeds from selling two vehicles (a 1997 Jeep and 1989 Ford) for

---

[98] *Terry Thomas Jr. v. State*, C.A. No. N19M-01-094, Petition for Return of Property, ¶ 4(b).
[99] D.I. 39, May 24, 2023 Trial Tr. at 58:24- 59:1.
[100] *See* Plaintiff's Ex. 9, Receipts.  Plaintiff offered no additional testimonial or documentary evidence to corroborate his incomplete business receipts, and two receipts purportedly evidencing parts sales occurred on January 5, 2019, the same day as the traffic stop and seizure.  Plaintiff

22

$7,000.00.[101]  With respect to the vehicle sales, Plaintiff produced two "Seller's Report of Sale" documents that were neither completely filled in nor signed by the vehicle's seller.[102]

Despite Plaintiff being unable to recall, at the traffic stop, the source or purpose of possessing more than $12,000.00, Plaintiff's wife, Sunday Grubb ("Grubb"), testified Plaintiff possessed the cash on January 5, 2019 with the intention of purchasing a tow truck in Delaware City, Delaware.  At trial, Grubb could not recall the seller's asking price for the tow truck but believed "it would've been $8,000.00 or $10,000.00 dollars."[103]  She later testified the owner of the tow truck was asking $15,000.00 for the vehicle.[104]

Grubb also testified that on January 5, 2019, the day of the car stop and seizure, she and Plaintiff returned to Delaware City with a mechanic so the mechanic could evaluate the tow truck.  Eventually, according to Grubb, the purchase was abandoned when the mechanic advised the truck had a lot of rust.[105]

_____

failed to recall these alleged business transactions when the police asked him to explain the source and/or purpose of the money.

[101] Plaintiff claimed on December 20, 2018, he was paid $3,000.00 by Sylvia DeHoff for the installation of a motor and transmission (*Id.* at 63:20-23), and on December 12, 2018, he was paid $2,000.00 by Brian Sullivan for a "motor and transmission." (*Id.* at 64:14-17).  Plaintiff failed to produce any competent corroborating evidence of either business transaction.

[102] *See* Plaintiff's Ex. 10. The title for the 1989 Ford truck is dated January 4, 2019, and just one day later, Plaintiff could not recall this $4,500.00 cash transaction when the police asked him for the source of the currency in his possession.

[103]  D.I. 38, April 23, 2023 Trial Tr. at 249:4-7.

[104]  *Id.* at 249:14-17.

[105]  *Id.* at 251:22 – 252:9.

23

At trial, Plaintiff also claimed he possessed the $9,980.00 seized from the trunk of the vehicle because he went to potentially purchase a tow truck from Most Wanted Towing.[106] He also claimed the money was "acquired multiple ways,"[107] evidenced by the incomplete business receipts admitted during his testimony.[108]

Based on the evidence presented, Plaintiff has failed to demonstrate, by a preponderance of the evidence, that the seized funds were not subject to forfeiture. When asked by Detective Arnold to identify a legitimate source of the seized currency on January 5, 2019, Plaintiff provided the Detective three purported employers, the first two of which could not be found during a business license check, and despite being given multiple opportunities to do so, he failed to provide the specific source of the currency. At trial, he offered evidence that the money was to purchase a tow truck – an explanation, that if true, would have been at the front of his mind on January 5, 2019. Considering these circumstances, Plaintiff's and Grubb's testimony in shopping for a tow truck is not credible.

Moreover, Plaintiff also provides dated receipts that he received $4,500.00 from "Janice Brock" on January 4, 2019,[109] and sold vehicle parts totaling $900.00

---

[106] D.I. 39, May 24, 2023 Trial Tr. 57:17-25.

[107] *Id.*, at 58:24 – 59-1.

[108] Plaintiff's Ex. 9 and 10. Plaintiff indicated that he does not have a Delaware dealer's license, and he suggested it was illegal for him to sell vehicles without a Delaware dealer's license. *Id.* at 61:19-25.

[109] Plaintiff's Ex. 10, Seller's Report of Sale. Plaintiff claimed he sold a van, which was in his name, to John Brock, for $4,500.00 on January 4, 2019. DI 39, May 24, 2023 Trial Tr. at 62:25 – 63:4.

on January 5, 2019.[110]  His inability at the scene of the car stop to recall any specific financial transaction on January 4th or 5th, 2019 in selling cars and/or parts to explain the currency in his possession on the same day as the seizure is not credible.  A reasonable person would recall at least some of these financial transactions when questioned by the police about the possession and source of a large amount of currency.  And, as noted above, the documentary receipts are incomplete and are not corroborated by bank records[111] or any other documentary evidence.  As one example, Plaintiff's submission of the State of Delaware Division of Motor Vehicle's Seller's Report of Sale for vehicle sale transactions are unsigned by the vehicle sellers.[112]  Plaintiff's testimony and incomplete documentary evidence does not credibly establish, by a preponderance of the evidence, that the money seized was obtained from a lawful source and is not subject to forfeiture.

### 2.  The October 10, 2019 seizure.

Before addressing the merits of Plaintiff's claim that the seized funds are not subject to forfeiture, the Court will address a discovery violation revealed during the State's cross-examination of Plaintiff at trial.

---

[110]  Plaintiff's Ex. 9, Receipts.
[111]  Plaintiff did not offer into evidence any 2019 bank records, but the bank records admitted into evidence suggested Plaintiff may have been improperly receiving unemployment benefits from the State of Delaware.
[112]  Plaintiff's Ex. 10, Seller's Report of Sale.  Plaintiff admitted he does not have a dealer's license to sell vehicles in Delaware, and despite Plaintiff describing his activity as "illegal," Plaintiff continued to sell vehicles without a dealer's license.  DI 39, May 24, 2023 Trial Tr. at 61:19 – 62:1.

### a. Discovery Violation.

On May 24, 2023, the State was cross-examining Plaintiff about the currency seized during the second car stop in 2019, when the following exchange occurred:

**Question:** Okay, so you did not have a business – you did not have a banking account for your business, correct?
**Answer:** No, Sir.
**Question:** All right, and you didn't have any business ledgers either, did you?
**Answer:** What do you – what's a business ledger?
**Question:** Well, somewhere where you would keep a ledger of all of your business.
**Answer:** Yes, I do.
**Question:** And do you recall when the State asked you in interrogatories for a copy of such ledger?
**Answer:** No, I don't, but I, that sounds like something that's in there. I don't –
**Question:** Okay, and so, do you remember the State asking "please send me any and all documentation that shows legal receipt of the cash," and your response was, "as the sole owner and proprietor of a fledgling business, I do not maintain a formal ledger or accounting statement which I can provide." Do you remember that?
**Answer:** Yes. I wasn't providing it for you guys. Just like when [Detective Arnold] asked me where's my business, I wasn't going to provide that because [the police] sit out there and [they] harass me. This is – these are the things that these officers do.
**Question:** Okay, so are you telling the Court that your response to the interrogatory was not truthful?
**Answer:** Can you read it again?
**Question:** As the sole owner and proprietor of a fledgling business, I do not maintain a formal ledger or accounting statement which I can provide.
**Answer:** Yes, I was not providing it for you.
**Question:** Okay, so you're saying you do have a ledger or accounting system that you could have provided?
**Answer:** Yes, I have books where I keep documents. Buy, sales, catalytic converters, how much money I got from my CAD guy, how much money I got from EMR, which is the junk scrap yard on Route 9.

26

**Question:** And you've chosen to hide that from the State?
**Answer:** I'm not, I didn't hide it. I chose not to send it to you. I chose to send you the receipts and documentation where the money came from.
**Question:** And this was back in November 2019, correct? So, between 2019 and within a year [of May 24, 2023] you had access to this ledger?
**Answer:** Yes. I'm pretty sure, yeah.
**Question:** So, you could've provided it?
**Answer:** Yes, I could've.[113]

While the State did not seek a sanction for Plaintiff's discovery violation, the violation was only brought to light on the final day of trial, during the cross-examination of Plaintiff. Plaintiff's testimony establishes he willfully chose to falsely answer an interrogatory and failed to produce requested documentary evidence – business records -- which are relevant to a critical issue of these Petitions for Return of Property -- whether the currency possessed by Plaintiff was acquired and possessed by lawful means and not subject to the presumption of forfeiture.

As the Delaware Supreme Court discussed in *Holt v. Holt*, this Court has an obligation to address willful discovery violations:

> Discovery abuse has no place in our courts, and the protection of litigants, the public, and the bar demands nothing less than that our trial courts be diligent in promptly and effectively taking corrective action to "secure the just, speedy and inexpensive determination of *every* proceeding" before them.[114]

---

[113] *Id.* at 110:4 -112:13.
[114] *Holt v. Holt*, 472 A.2d 820, 824 (Del. 1984), quoting Del Super. Ct. R. Civ. Pro. 1.

While there are a range of discovery violations and remedies available based on the violation,[115] a trial court's response to a discovery violation should serve two purposes: (a) to penalize the violating party, and (b) to "deter those who may be tempted to abuse the legal system by their irresponsible conduct."[116]

Plaintiff instituted these three Petitions for Return of Property, and chose to proceed *pro se*. In so doing, he chose to forgo the assistance of counsel in answering the State's interrogatories, and admitted under oath that he willfully chose to deny the existence of pertinent business records and did not provide them to the State. By doing so, Plaintiff impeded the pursuit of justice and the State's ability to defend at least one of these Petitions for Return of Property, and negatively impacted his credibility as a litigant and witness.

Plaintiff's refusal to truthfully answer the interrogatory and provide the State the business ledgers will result in an additional Court imposed sanction – a negative inference will be implied as to the existence of business records which could corroborate Plaintiff's testimony or evidence. And, if such records were produced in discovery, the records would not support a claim by Plaintiff that such documents corroborate or support his testimony or other evidence.

---

[115] The remedies available for discovery violations include, but are not limited to, the entry of default judgment; the entry of an evidence preclusion order; the Court's imposition of adverse factual determinations and/or adverse inferences from the evidence presented; and modifications to the burden of proof. *Terramar Retail Centers, LLC v. Marion # 2 Seaport Trust, U/A/D June 21, 2002*, 2018 WL 6331622, at *9-11 (Del. Ch. Dec. 4, 2018).

[116] *Hoag v. Amex Assurance Co.*, 953 A.2d 713, 717 (Del. 2008), quoting *Holt*, 472 A.2d at 820.

This corrective action is limited to the October 10, 2019 Petition for Return of Property, because that is the specific litigation where the discovery violation was uncovered by the State. It is intended to punish Plaintiff for his willful noncompliance with discovery and to discourage future litigants from engaging in similar willful conduct which is detrimental to the administration of justice and the just, speedy and inexpensive determination of this proceeding.

### b. The State has established probable cause that the seized funds were subject to forfeiture.

The October 10, 2019 traffic stop and seizure is supported by probable cause that the seized currency is subject to forfeiture, and Plaintiff has failed to establish, by a preponderance of the evidence, that the money is not subject to forfeiture.

On October 10, 2019, as the police walked upon Plaintiff's black Cadillac, they detected an odor of marijuana emanating from the vehicle. Upon searching the vehicle, the police seized (a) approximately three pounds of marijuana from the trunk, (b) two cell phones, and (c) $8,832.00. When Detective Arnold asked Plaintiff to provide a source for the currency, Plaintiff claimed he earned the money selling catalytic converters. Upon return to NCCPD, a canine sniff test on the seized currency resulted in a positive alert for the presence of trace amounts of illegal substances on the money. Furthermore, the phone data extraction reports uncovered damning texts between Plaintiff and others evidencing numerous marijuana sales and solicitations occurring at and around the time of the car stop, in quantities from

an ounce to a quarter pound of marijuana. Finally, the October 10, 2019 vehicle stop conducted by the MET Team was the second seizure within a year involving the Plaintiff's possession of a large quantity of currency tainted by trace amounts of illegal substances.[117]

Based on the evidence admitted at trial, the State has established probable cause that the seized money was "furnished or intended to be furnished, in exchange for a controlled substance or drug paraphernalia," pursuant to 16 *Del. C.* § 4784(a)(7). And, the same evidence, through the testimony of Corporal Smack, established probable cause for the existence of trace elements of illegal drugs present on the currency, satisfying 16 *Del. C.* § 4784(a)(7)(b).

### c. The Plaintiff has failed to rebut, by a preponderance of the evidence, the presumption of forfeiture.

Plaintiff contends the seized currency is not subject to forfeiture. At the car stop and seizure, Plaintiff claimed the money was earned through the sale of "catalytic converters." And, in the Petition for Return of Property, Plaintiff generically claimed the "[c]urrency [was] received on October 11, 2019 through [a] lawful business transaction between Brendan McGhee and AMERIKINGZ AUTOMOTIVE."[118]

---

[117] As the second seizure involved many of the same police officers from the January 2019 vehicle stop and seizure the police were able to rely upon their collective prior knowledge of Plaintiff when formulating probable cause to seize the Plaintiff's property in October 2019.
[118] *Terry Thomas v. State*, C.A. No. N19M-12-202, Petition for Return of Property, ¶ 8.

At trial, Jason Miller ("Miller") testified that he and Plaintiff had a business deal involving the sale of "10 or 11 cars," for a sale price of $800 per car.[119] Miller claimed that on October 10, 2019, his business, BBJ Towing, negotiated the sale of the eleven vehicles and on that same day, Miller towed three of the eleven cars. The next day, Miller towed the remaining eight cars.[120] According to Miller, the plan was for Plaintiff to come to Rambleton Acres to receive payment on October 11, 2019.[121] Miller specifically denied being present when Plaintiff was paid,[122] but he believed Plaintiff was paid on October 11, 2019.[123]

Consistent with Miller's testimony, Plaintiff testified that on October 10, 2019, he made a "deal with BBJ for the purchase of eleven cars."[124] He explained he sold the cars to BBJ Towing for $800.00 each because the cars had catalytic converters.[125] Plaintiff testified three cars were towed on October 10, and the remaining cars were towed October 11. Once all eleven cars were towed, Plaintiff went to Rambleton Acres on October 11, 2019 and picked up the "rest of the total money."[126] He also claimed Jason Miller was present when he was paid.[127]

---

[119] D.I. 39, May 24, 2023 Trial Tr. at 6:5-12. Miller testified his business partners purchased cars from Plaintiff. He did not specifically mention catalytic converters.
[120] *Id.* at 6:12-15.
[121] *Id.* at 7:4-12; 11:24-25, 12:7.
[122] *Id.*
[123] *Id.* at 14:12-25 -- 15:1-4.
[124] *Id.* at 66:15-17.
[125] *Id.* at 66:17-19.
[126] *Id.* at 66: 21-25.
[127] *Id.* at 67:3-5.

To explain the three pounds of marijuana seized from the vehicle, Plaintiff claimed he and his two friends, Shanaal and Andy, were just "potheads," growing weed in a basement.[128] But, the quantity of marijuana, its street value and packaging, and Plaintiff's text messages tell a different story. Plaintiff possessed three pounds of marijuana at the time of the car stop, with a street value of at least $7,200.00.[129] Thor alerted to the presence of illegal drugs on the currency, and the Samsung and iPhone data extraction reports document Plaintiff engaging in multiple marijuana sales and solicitations in the days leading up to, and the day of, the vehicle stop on October 10, 2019. The text messages demonstrate Plaintiff was a marijuana dealer.

Plaintiff has failed to demonstrate by a preponderance of the evidence, (1) the seized currency was the product of a legitimate business transaction, and (2) the seized currency was not subject to forfeiture. First, the car stop and seizure of currency from Plaintiff's vehicle occurred on October 10, 2019, not on October 11, 2019. It was on October 10 that Detective Arnold observed Plaintiff commit a traffic violation, searched his vehicle and seized three pounds of marijuana and the currency. In the Petition for Return of Property for this seizure, and during Plaintiff's testimony, Plaintiff specifically claims he sold eleven vehicles for $8,800.00 and

---

[128]  *Id.* at 69:12-21. Plaintiff did not address any of the text messages recovered from the Samsung and iPhone cellphones indicating marijuana dealing.
[129] The street value of the marijuana, as noted *supra* at fn. 47, was calculated using Plaintiff's selling price for a quarter pound of marijuana ($600.00), or an ounce of marijuana ($150.00), as indicated in the cellphone extraction reports.

received payment on October 11, 2019. And, the payment for the eleven cars was confirmed by Miller as October 11, 2019. Plaintiff may have been paid $8,800.00 for selling eleven cars, but the sale and transfer of vehicles, and resulting payment, occurred at least one day after the police seized the currency on October 10, 2019. Plaintiff has failed to overcome, by a preponderance of the evidence, the presumption of forfeiture.

### 3. The April 28, 2021 Traffic Stop.

#### a. The State has established probable cause that the seized funds were subject to forfeiture.

As to the final seizure on April 28, 2021, the State has established probable cause for the seizure of the currency and the institution of forfeiture proceedings. The State's evidence established probable cause that the seized money was "furnished or intended to be furnished, in exchange for a controlled substance or drug paraphernalia" satisfying 16 *Del. C.* § 4784(a)(7).

The evidence supporting probable cause begins with the observations of Detective Gruber on April 27, 2021, one day prior, when Detective Gruber observed what he believed to be a marijuana delivery from Plaintiff to a known drug dealer and user, Thomas Epperson, on April 27, 2021.[130] On that date, Plaintiff drove the

---

[130] Plaintiff claimed he and Epperson have been friends since he was 11 or 12 years old, their relationship has "nothing to do with drugs," and he had no knowledge of Epperson's involvement with drug dealing from his residence. *Id.* at 84:1 – 85:7.

same car, and removed the suspected package of drugs from the same trunk where the police recovered three pounds of marijuana on October 10, 2019, and brought the package inside Epperson's residence, and left shortly after without it.

On the very next day, April 28, 2021, Sergeant Golden recognized Plaintiff's car, pursued the same, and eventually pulled the vehicle over in a Ruby Tuesday parking lot. As he approached the vehicle on foot, he noted a strong odor of raw marijuana. And, as Sergeant Golden explained, he believed Plaintiff was either actively concealing contraband or reaching for a weapon immediately before being contacted by the NCCPD officers. When removed from the vehicle, Plaintiff's pants and belt were unbuckled and his zipper was down. The initial search of Plaintiff resulted in the discovery and seizure of $453.00 from his pants pocket, and when he was initially asked how much money he had, before being comprehensively searched, Plaintiff told the officer "a couple hundred bucks." A subsequent search of Plaintiff resulted in the seizure of $5,600.00, which was banded with a rubber band and hidden in his groin. Plaintiff had just hidden the bundled currency down his pants and attempted to mislead the police in the amount of money he possessed at the time of the vehicle stop.

When searching the vehicle, the police recovered bags of marijuana in: (a) a concealed compartment in the center console; (b) in the passenger's bookbag; and (c) in a box in the trunk of the vehicle. The bags containing the marijuana were

34

consistent in color and type, and the passenger's backpack included a digital scale and additional plastic baggies. Although the passenger claimed ownership of all of the recovered marijuana, his assertion of ownership was not credible. More specifically, his claim of ownership of the separate bags of marijuana evolved as the search of the vehicle evolved. As to the marijuana found with the digital scale and additional baggies in the passenger's backpack, he immediately claimed ownership *of his backpack* and its contents. But, after that, marijuana was discovered in at least two separate and distinct locations in the vehicle that the passenger was seemingly unaware of until the contraband was discovered by the police. For example, the passenger did not know how to access the dashboard compartment *of Plaintiff's vehicle* where the police found a bag of marijuana, and it was only after the police found the marijuana in the concealed dashboard compartment that the passenger claimed the bag of marijuana was his. Then, the passenger asserted ownership of the bags of marijuana found in the trunk *of Plaintiff's vehicle* only after that marijuana was discovered by the police. There is an obvious disconnect between the passenger's claim to possess all the marijuana in the vehicle and his lack of knowledge of the existence of the marijuana in different locations in the vehicle, and how to access the compartment in the dashboard. The passenger's claims of ownership of the marijuana recovered in the vehicle, as relayed by the officers on scene, is not credible.

Based on the foregoing, the State established probable cause that the seized money was "found in close proximity to forfeitable controlled substances" pursuant to 16 *Del. C.* § 4784(a)(7)(a) and/or was "furnished or intended to be furnished, in exchange for a controlled substance or drug paraphernalia" pursuant to 16 *Del. C.* § 4784(a)(7).

### b. The Plaintiff has failed to rebut, by a preponderance of the evidence, the presumption of forfeiture.

In the Petition for Return of Property, Plaintiff attempts to rebut the presumption of forfeiture by claiming the currency was "personal property and the proceeds from a vehicle sale conducted by AMERIKINGZ AUTOMOTIVE."[131]

At trial, Plaintiff claimed to have sold a Ford E-350 van on April 27, 2021,[132] and 1987 Monte Carlo and a 1979 El Camino on April 28, 2021,[133] but he has not provided any admissible documentary evidence (business receipts, Sellers Report of Sale, DMV records, vehicle titles, sales contracts, etc.) or admissible corroborating evidence (the testimony of a buyer or a witness to the transactions) to support his claim that vehicle sales actually occurred and the money constituted proceeds from vehicle sales. Plaintiff expects this Court to accept his testimony as proof of business transactions to rebut the presumption of forfeitability, but his interactions with the

---

[131] *Terry Thomas v. State of Delaware*, C.A. No. N21M-06-074, Petition for Return of Property, ¶ 3.
[132] D.I. 39, May 24, 2023 Trial Tr. at 76:1-5.
[133] *Id.* at 74:9-13.

police and his testimony was proven to be deceptive, unreliable, untrustworthy, and not credible, and his claims of legitimate business transactions are not supported by complete sales records, and in many instances, no business records at all.

Finally, to explain possessing $6,053.00 on April 28, 2023, Plaintiff claims the money was intended to pay for renovations to his mother's house, specifically concrete being delivered pursuant to a contract with "F Brother's Services" -- to complete remodeling and construction work at his family's home at 34 Ruben's Circle, Newark, Delaware. More specifically, Plaintiff and his mother testified a remodeling contract was executed for work to be completed located at 34 Ruben's Circle, and Plaintiff testified he was supposed to bring the contractor $5,600.00 on April 28, 2021 for a concrete delivery.[134] To support this claim, Plaintiff relies in part upon an August 11, 2020 estimate to replace the roof on the residence for $8,000.00.[135] The proposal included labor and materials and required a 50% deposit.[136]

On August 22, 2020, a second estimate was prepared, which included the aforementioned roofing work as well as remodeling to the kitchen, bedrooms, living room, laundry room, bathrooms, flooring and plumbing.[137] The contract price was

---

[134] *Id.* at 70:19-23.
[135] To support this claim, Plaintiff relies on several documents (labeled proposals or invoices) from F Brothers Contracting with different dates, and those documents have been admitted as one exhibit. *See* Plaintiff's Ex. 5.
[136] *Id.*
[137] *Id.*

$41,000.00, and required a 50% deposit/payment, followed by a 25% payment "through the middle" and 25% final payment at the end of the project.[138] An August 22, 2020 receipt for $20,500 payment was also submitted into evidence.[139]

On January 8, 2021, a "Second Contract" was prepared, billable to Plaintiff's mother, Ivanetta Thomas.[140] This contract includes "concrete front house sidewalk entrance," remodeling of the back room, back yard patio, a second-floor deck, and constructing a shed.[141] But, unlike the prior estimates/invoices, it is silent as to payment terms, deposit dates, and a completion date, etc.[142] As Plaintiff conceded during cross-examination, Plaintiff's Ex. 5 does not require a specific deposit for or prepayment of concrete on a specific date,[143] does not require a specific payment of $5,600.00,[144] and does not corroborate Plaintiff's testimony regarding the need for payment of a deposit to complete the concrete work on April 28, 2021.

Again, the Court finds Plaintiff's uncorroborated testimony lacking credibility, as the construction invoices do not require prepayment of a deposit or materials before work is completed. Under these circumstances, Plaintiff has failed to rebut, by a preponderance of the evidence, the presumption of forfeitability,

---

[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] D.I. 39, May 24, 2023 Trial Tr. at 94:3-10.
[144] *Id.* at 94:12 – 95:2.

particularly when (a) one day prior, he is observed by Detective Gruber delivering a package assumed to contain illicit substances to a known drug dealer and drug user, Thomas Epperson; (b) at the car stop, Plaintiff misled the police about the amount of money in his possession and attempted to hide $5,600.00 in his boxer shorts;[145] (c) Plaintiff never told the police the money was intended to pay for concrete work;[146] (d) the police located and seized multiple baggies of marijuana in Plaintiff's vehicle in at least three separate locations; (e) Plaintiff was driving a vehicle with a passenger who was in possession of a scale, marijuana, and baggies in a backpack; (f) the passenger incredibly claimed ownership of marijuana concealed in a dashboard compartment of Plaintiff's vehicle (which the passenger was unable to open), and ownership of marijuana in the trunk of Plaintiff's vehicle (which the passenger failed to disclose prior to it being discovered by law enforcement); and (g) if the money was actually for a concrete deposit, which is not documented in or required by the contract or invoices in Plaintiff's Ex. 5, Plaintiff had no credible reason to obscure the total amount of money in his possession or hide a large wad of currency in his boxer shorts. Plaintiff's reason for possessing the money (to pay for concrete) could have been corroborated by the police when seized, if Plaintiff had simply explained the circumstances and provided the officers the remodeling

---

[145] *Id.* at 102:25 – 103:2 ("I was trying to conceal my money, so I wouldn't tell them I had six grand.")

[146] *Id.* at 100:3-11.

contractor's phone number. But he did not. Instead, Plaintiff misled the police about the amount of money he possessed, and then attempted to hide the money from the police, engaging in additional deceptive behavior.

## CONCLUSION

Under the circumstances of each seizure, considered independently, the State has established probable cause that the currency seized on January 5, 2019, October 10, 2019 and April 28, 2021 belonged to Plaintiff and was subject to forfeiture pursuant to the Chapter 47 of Delaware's Uniformed Controlled Substances Act. Plaintiff has failed, by a preponderance of the evidence, to rebut the presumption in favor of forfeiture and the three Petitions for Return of Property are **DENIED**.

**IT IS SO ORDERED**, this 16th day of January, 2024.

Martin B. O'Connor
Commissioner